UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LARRY D., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, <br>    ACTING COMMISSIONER OF SOCIAL SECURITY,[1] <br><br> Defendant. | No. 20 CV 2518 <br><br> Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

    Plaintiff Larry D. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying his application for benefits. For the following reasons, the Court grants plaintiff's motion for summary judgment [16],[2] denies the Commissioner of Social Security's motion for summary judgment [21], and reverses the SSA's decision.

**Background**

    In early December 2015, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of December 31, 2011. [11-1] 21. Plaintiff's claims were denied initially and on reconsideration. [*Id.*]. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) on July 28, 2017. [*Id.*]. Plaintiff also appeared and testified at a supplemental hearing held by the ALJ to obtain expert medical testimony on January 8, 2019. [*Id.*]. In a decision dated February 27, 2019, the ALJ ruled that plaintiff was not disabled. [*Id.*] 40. The Appeals Council denied review on March 2, 2020, making the ALJ's decision the agency's final decision. [*Id.*] 1-3. *See* 20 C.F.R. §§ 404.955, 404.981.

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, with the exception of citations to the administrative record [11], which refer to the page numbers in the bottom right corner of each page.

1

Plaintiff timely appealed to this Court. [1]. The Court has jurisdiction to review the Acting Commissioner's decision under 42 U.S.C. § 405(g).[3]

Plaintiff was born with spinal stenosis, a condition that narrows the spinal canal. [11-1] 77; [11-9] 877. Five months before plaintiff's alleged onset date, plaintiff visited his primary care physician (PCP) Dr. Adam Rubenstein, reporting more back pain than usual despite taking Hydrocodone, a prescribed opioid to treat severe pain, three times a day. [11-1] 24; [11-9] 877. His PCP diagnosed plaintiff with chronic intermittent back pain and continued to prescribe opioids to manage his pain. [11-9] 877-78. Leading up to his alleged onset date, plaintiff visited his PCP two more times, in addition to his yearly physical. [*Id.*] 879, 881, 885. During each visit, plaintiff's PCP continued to diagnose plaintiff with chronic intermittent back pain, noting that his symptoms included "chronic pain" or "back pain." [*Id.*] 879-81, 884-85.

Between plaintiff's alleged onset date and his date last insured, March 31, 2013, plaintiff visited his PCP and orthopedic spine specialist, Dr. Vivek Mohan, three times for back pain or related back pain. [11-1] 24; [11-9] 793, 797; [11-10] 896. A spine exam conducted in March 2013 revealed degenerative changes in plaintiff's cervical and lumbar spine. [11-8] 790-92. Dr. Mohan diagnosed plaintiff with cervical and lumbar stenosis and ordered spine MRIs. [*Id.*] 792. Dr. Mohan also recommended plaintiff continue to take non-steroidal anti-inflammatory drugs and begin physical therapy if the spine degeneration was not severe. [*Id.*]. The MRIs showed plaintiff suffers from multiple-level degenerative disc disease, in addition to cervical and lumbar spinal stenosis. [11-9] 794-95; [11-1] 73. Dr. Mohan ordered a cervical epidural and lumbar spine evaluation, in addition to physical therapy treatment. [11-9] 795. Dr. Mohan later revised this recommendation due to the severity of plaintiff's stenosis and ordered a lumbar epidural and advised surgery. [*Id.*] 797, 799.

A day after plaintiff's date last insured, he visited his physical therapist for a pre-operative evaluation. [*Id.*] 800. Plaintiff reported that he had neck pain for about six years that had become progressively worse over the past several years and that physical therapy in the past had not improved his pain. [*Id.*]. He described his pain level as 6/10 constantly but, at times up to 8/10. [*Id.*]. Plaintiff reported that he had no recreational activities. [*Id.*].

In the six months following plaintiff's date last insured, plaintiff consistently rated his pain between 5/10 and 6/10, going up as high as 9/10 and even 11/10. [*Id.*] 800, 808, 827, 829. In addition, plaintiff reported constant and worsening pain to his treating physicians during at least four appointments. [*Id.*] 803, 805, 816-18. Treating physicians continually tried new methods and combinations of prescription pain

---

[3] The parties have consented to the exercise of jurisdiction in this case by a United States Magistrate Judge. [7].

2

medications to control plaintiff's pain such as ordering two lumbar epidural injections, continuing physical therapy, and referring plaintiff to pain specialist Dr. Jay Hurh. [*Id.*] 795, 797-99, 832. Plaintiff also underwent both neck and back surgery. [11-8] 716-17, 761. A little over six months after his date last insured, plaintiff described his pain as "excruciating." [11-9] 827. Both Dr. Mohan and Dr. Hurh concluded that despite surgical and non-surgical intervention, plaintiff's back and neck pain remained unimproved. [11-13] 1213; [11-14] 1312.

Plaintiff testified that his chronic pain made him leave his job, disrupted his sleep, at times staying up for multiple days straight, and prevented him from walking no more than half a block before needing to sit down and from sitting for longer than twenty minutes. [11-2] 126, 139-40, 144. Plaintiff added that he needed help from his wife to shower and dress, and had not done chores or prepared a meal for himself or his wife since 2011. [*Id.*] 145, 147. Plaintiff brought with him to the initial administrative hearing the charger for his spinal cord stimulator that was implanted several years ago to reduce his pain. [*Id.*] 154. He explained that with the spinal cord stimulator in combination with his pain medication, his pain level ranged from seven and a half up to ten. [*Id.*] 142. Plaintiff added that his pain medication, prescribed opioids, caused additional symptoms, including dizziness, nausea, vomiting, and memory problems. [*Id.*] 135. He testified that he tried to wean himself off opioids, but the pain was too severe. [11-1] 67. At the supplemental hearing, plaintiff used a walker to ambulate. [*Id.*] 62. Plaintiff explained that Dr. Hurh recommended one and that he used the walker daily. [*Id.*] 62-63. During both hearings, plaintiff requested breaks to either stand or walk around. [11-1] 77; [11-2] 140, 146.

Following plaintiff's testimony, a medical expert (ME) testified that he found plaintiff's pain allegations legitimate because "a number of physicians have seen him" and "advised invasive procedures." [11-1] 77. The ME explained that "[n]one of these . . . procedures . . . would be considered or performed lightly, unless they really were convinced that he was having significant symptomatology." [*Id.*]. The ME added that in his opinion plaintiff's condition equaled the 1.04A listing based on plaintiff's pain. [*Id.*] 78. He further explained that objective findings to support plaintiff's pain included his bulging discs and discogenic disease, documented by the imaging studies taken of his lumbar spine and neck. [*Id.*] 79. Later in his testimony, the ME stated that "this is primarily a situation where it's pain that's the limiting factor." [*Id.*] 84.

## Legal Standard

Under the Social Security Act, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a sequential five-step inquiry: (1) whether the claimant has performed any substantial gainful activity during the period for which he claims disability; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform his past relevant work (i.e., the claimant retains the residual functional capacity (RFC) to perform his past); and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience (i.e., able to perform any other work existing in significant numbers in the national economy). *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that the claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

"The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence." 42 U.S.C. §405(g). Substantial evidence is a standard that "requires more than a mere scintilla of proof and instead such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walker v. Berryhill*, 900 F.3d 479, 482 (7th Cir. 2018). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted); *see also Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) ("When an ALJ recommends that the agency deny benefits, it must first 'build an accurate and logical bridge from the evidence to the conclusion.'") (internal citation omitted).

## The ALJ's Decision

At Step One, the ALJ found that plaintiff had not performed substantial gainful activity since his alleged onset date of December 31, 2011. [11-1] 24. At Step Two, the ALJ determined that plaintiff had the following severe impairments: congenital spinal stenosis with degenerative disc disease ("DDD") of the lumbar and cervical spine; and obesity. [*Id.*]. At Step Three, the ALJ ruled that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. [*Id.*] 25.

4

Before turning to Step Four, the ALJ found that, considering the entire record, plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except plaintiff can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, or crawl. [*Id.*] 27. The ALJ added that plaintiff cannot climb ladders, ropes, or scaffolds, and cannot be exposed to dangerous moving machinery or unprotected heights. [*Id.*].

The ALJ found plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but plaintiff's statements concerning "the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." [*Id.*] 28. The ALJ explained that while plaintiff would highly rate his pain, he would do so inconsistently and continued to perform physical activities daily including, walking over a mile. [*Id.*] 32. The ALJ also pointed out that despite plaintiff's claim that he became disabled in December 2011, he did not apply for disability until May 2014. [*Id.*] 34. The ALJ further noted that throughout the relevant period, plaintiff had "unremarkable objective findings to support disabling limitations correlated to his pain complaints." [*Id.*] 35. Finally, the ALJ cited plaintiff's chronic opioid use as an indication that plaintiff exaggerated his complaints to ensure doctors would continue prescribing narcotics. [*Id.*].

At Step Four, the ALJ found that plaintiff could perform past relevant work as a mortgage loan officer and as a finance manager at an auto dealership. [*Id.*] 37. The ALJ therefore concluded a finding of "not disabled" was appropriate. [*Id.*] 40.

## Discussion

Plaintiff contends the ALJ committed several errors when she discredited his testimony about the severity and persistence of his symptoms, specifically his chronic pain. [16] 14-18. These alleged errors include the ALJ's failure to analyze plaintiff's daily activities or subjective complaints and the ALJ's "cherry-picking" of the record to support her conclusion that plaintiff may have exaggerated his pain complaints because he is addicted to opioids. [*Id.*] 17. According to plaintiff, these errors are grounds for remand because the ALJ's adverse credibility determination resulted in the ALJ rejecting several of plaintiff's claimed limitations and therefore, impacted the ultimate RFC assessment. [*Id.*] 17-18. The Commissioner responds that the ALJ did discuss plaintiff's physical activities at length, referring to plaintiff's daily walks and trip to Florida. [22] 8-9. The Commissioner adds that while the ALJ did cite plaintiff's long-term opioid use as a reason to discount plaintiff's pain complaints, even if the Court finds the ALJ's reason invalid, the ALJ provided six other bases in support of her credibility determination. [*Id.*] 6, 8, 10.

5

This Court generally must accord "special deference" to the ALJ's credibility determination, because she "is in the best position to see and hear the witness and determine credibility." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 631 (N.D. Ill. 2009) (citing *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). For that reason, the Court may only overturn the ALJ's adverse credibility determination if it is "patently wrong." *Elder*, 529 F.3d at 413-14. A credibility determination is "patently wrong" if it "lacks any explanation or support." *Id.* An ALJ's determination regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers, the weight the adjudicator gave to the individual's statements and the reasons for that weight." *See* SSR 96-7p 1996 WL 374186, at *4 (S.S.A. 1996).

Before an ALJ can discount a claimant's subjective complaints of pain, an ALJ must consider several factors that include: (1) relevant medical evidence, including intensity and limiting effects of symptoms; (2) treatment and efficacy; (3) return to gainful activity; (4) work during disability period; (5) daily activities; and (6) statements inconsistent with the record. *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022). The ALJ must then weigh these factors to determine whether the claimant's complaints are inconsistent with the evidence as a whole. *Flores v. Massanari*, 19 Fed App'x 393, 403 (7th Cir. 2001) (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)). As objective medical evidence is just one factor, the ALJ may not rely solely on a lack of objective evidence, such as a lack of support from diagnostic examinations and test results, to discredit a claimant's pain complaints. *See Lambert v. Berryhill*, 896 F.3d 768, 778 (7th Cir. 2018) (citing *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014)).

Here, the ALJ determined that the medical evidence and other evidence in the record did not provide strong support for plaintiff's claimed symptoms and limitations. [11-1] 35. The ALJ's conclusion was based on several considerations. Because the ALJ's reasons for finding plaintiff's testimony incredible are not supported by the record, the Court concludes that the credibility determination was patently wrong, and the error cannot be deemed harmless.[4]

### I. The ALJ's Conclusion that Plaintiff Exhibited Drug-Seeking Behavior is Not Supported by the Record.

The ALJ found plaintiff's pain complaints were not entirely credible in part because plaintiff exhibited drug-seeking behavior. [11-1] 35. An ALJ may discount the testimony of a claimant who has engaged in drug-seeking behavior. *Kellems v. Astrue*, 382 Fed. App'x. 512, 515 (7th Cir. 2010). The Seventh Circuit and others

---

[4] Because this issue is dispositive, the Court need not address plaintiff's other arguments.

6

define drug-seeking behavior as obtaining or attempting to obtain, pain medication by deceiving or manipulating a medical professional. *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (plaintiff obtained medication refill by claiming the first doctor turned him away for financial reasons when the first doctor really refused to refill his medication because he discovered he was using cocaine); *see also Poppa v. Astrue*, 569 F.3d 1167, 1171-72 (10th Cir. 2009) (plaintiff attempted to obtain additional medication by asking doctor to postdate prescriptions and telling doctor she was going on vacation but, would not disclose how long she would be away); *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) (plaintiff was described by treating physician as "somewhat manipulative" in his efforts to convince him of his pain."). Whether a claimant engaged in drug-seeking behavior is an "issue where medical expertise . . . provide[s] insight" and the observations of treating physicians are highly relevant. *Hurlbut v. Colvin*, No. 15 CV 50270, 2017 WL 497774, at *4 (N.D. Ill. Feb. 7, 2017).

Here, the Court does not find any evidence in the record that plaintiff obtained, or attempted to obtain, pain medication by deceiving or manipulating a medical professional. The ALJ's purported evidence of drug seeking behavior hones in on an isolated incident and a handful of treatment notes, providing an incomplete description of plaintiff's medical records and ignoring medical opinion testimony. The ALJ focuses on plaintiff's visit to his PCP in July 2011, when plaintiff disclosed that he was taking opioids prescribed to him by another physician for migraines, in addition to taking opioids prescribed by his PCP, and that he did not admit this at the last visit for fear that his PCP would cut him off from all opioids. [11-1] 35 (citing [11-9] 879). However, this was an isolated event. *Kellems*, 382 Fed. Appx. at 516 (finding plaintiff's "methadone-seeking trip to the emergency room" was an isolated event and not conclusive evidence that plaintiff engaged in drug-seeking behavior). During the visit, plaintiff promised to only fill his opioid prescriptions from his PCP and to notify his PCP if he needs or wants to fill his prescriptions from another provider. [11-9] 880. There is no evidence that plaintiff ever broke this promise.

The ALJ's remaining evidence to support her conclusion that plaintiff exhibited drug-seeking behavior misinterprets the medical evidence and dismisses medical opinion testimony. The ALJ cites in support plaintiff's request for higher doses or different opioids. [11-1] 35. However, the ALJ's conclusion ignores the "possib[ility] that a person in severe pain would request more or different drugs." *Hurlbut*, 2017 WL 497774, at *4 (finding plaintiff's repeated calls to doctor to refill his medication before a refill was due did not unambiguously show drug-seeking behavior but, could also mean plaintiff was in severe pain). Further, no doctor ever made an explicit statement that plaintiff was exaggerating or faking his pain; in fact, his treating physicians regularly recommended more treatment. [11-9] 795, 797-99, 832. While his PCP noted that plaintiff's pain was out of proportion to an exam, his

7

PCP did not discontinue plaintiff's long-term opioid prescription, and as the ME testified, "this was just a single note." [11-1] 77; [11-10] 896.

Further, the ALJ's reasoning appears to painstakingly cherry pick evidence of drug-seeking behavior from the voluminous record while omitting discussion of the ME's opinion on this issue. As stated above, ALJs should consider medical expertise in determining whether a claimant has engaged in drug-seeking behavior. *Hurlbut*, 2017 WL 497774, at \*4. Here, the ME testified that plaintiff's "pain complaints are legitimate," and most relevant here, that the record did not demonstrate that plaintiff engaged in drug-seeking behavior. [11-1] 77, 89. The ME explained that while plaintiff was likely opioid dependent, there was no evidence that plaintiff was attempting to obtain pain medication from "numerous emergency rooms, numerous hospitals, [or] various physicians," to indicate that he was drug-seeking. [*Id.*] 88-89. The ME added that nothing in the PCP's treatment notes, even those notes expressing concern with plaintiff's long-term opioid use, indicated that plaintiff was "carrying out activity in order to get more opioids." [*Id.*] 89. The ALJ's treatment of the ME's testimony demonstrates that the ALJ "independently evaluated the evidence in this case and improperly substituted [her] judgment" for that of the ME. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

## II. The ALJ's Conclusion that Plaintiff's Physical Activities Undermine His Pain Complaints Draws Improper Inferences.

Many of the ALJ's remaining bases for finding plaintiff's pain complaints were not entirely credible largely relate to plaintiff's physical activities. [11-1] 32, 34-35. Specifically, the ALJ found that plaintiff's pain complaints were undermined by plaintiff's (1) undertaking of household chores; (2) daily walks; (3) trip to Florida; and (4) delay in applying for disability. [*Id.*]. As noted above, a claimant's daily activities are among the considerations an ALJ should weigh in evaluating a claimant's credibility. *Grotts*, 27 F.4th at 1278. The Court finds the ALJ's listed reasons either overstate or ignore evidence in the record, and thus, do not justify the ALJ's decision to discount plaintiff's testimony.

First, the ALJ discounted plaintiff's testimony partially based on his attempt to lift a heavy steel frame couch and his attempt to carry a washer down the stairs with his wife. [11-1] 35. A claimant's household activities should be considered in assessing his alleged symptoms, but "undue weight" should not be placed on these activities to assess his "ability to hold a job outside the home." *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). Here, the ALJ concluded plaintiff's attempt at these activities demonstrated that he is "not so limited as to prevent sedentary level exertion." [11-1] 35. The ALJ mentions, although glosses over, that these activities were not performed successfully and resulted in injuries necessitating medical care.

8

[11-1] 35; [11-11] 1088, 1090; [11-13] 1270. When plaintiff attempted to lift the steel frame, his elbow popped and his arm swelled. [11-11] 1088. He went to the emergency room where he was treated for a bicep strain. [*Id.*] 1090. When plaintiff attempted to carry the washer downstairs, he lost control and hit the bottom concrete wall with his toes. [11-13] 1270. He went to a podiatrist who assessed a phalanx fracture and instructed him to limit his walking. [*Id.*]. While the ALJ focused on plaintiff's *attempt* to undertake these household chores, *how* plaintiff carried out, or in plaintiff's case, how he failed to carry out those activities, is just, if not more relevant, to evaluating plaintiff's credibility and limitations. *See Craft*, 539 F.3d at 680 (reversing denial of disability, where ALJ focused on claimant's ability to shop but ignored that claimant used a motorized cart at the store). The ALJ's emphasis on plaintiff's attempts at these activities, rather than his ability to complete them, overstates plaintiff's physical activities and provides an improper basis to discount plaintiff's testimony.

The ALJ also described plaintiff as "being independent in home activities," citing a single post-operation note. [11-1] 35 (citing [11-9] 808). However, the ALJ ignored plaintiff's testimony that he did not do any chores around the house, he hired a cleaning service, and that he had not prepared meals for himself or his wife since December 2011. [11-2] 147. Nor did the ALJ address plaintiff's testimony that he needed help to shower and dress or that during both hearings plaintiff asked to take breaks to stand or walk around. [11-1] 77, 140, 145. While an ALJ need not address every piece of evidence in the record, an ALJ may not ignore an entire line of evidence contrary to its ruling. *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (reversing denial of disability where "ALJ cited [claimant's] ability to use a chainsaw [and] care for his child but ignored his testimony about the pain and fatigue these activities caused him and his limitations with them."). Here, the ALJ's selective discussion of only parts of plaintiff's testimony favorable to her decision was in error.

Second, the ALJ discredited plaintiff's pain complaints based on plaintiff's ability to walk one to one and a half miles a day with difficulties. [11-1] 35 (citing [11-9] 833). The ALJ failed to explain how plaintiff's daily walks are inconsistent with his pain complaints or contradictory with his testimony that he could only sit for twenty minutes at a time. [11-2] 139-40. While the ALJ emphasized the part of the physical therapist's note that states plaintiff is "able to walk 1-1.5 miles every day with difficulties," the ALJ omits another part of that same note that states plaintiff "continues with severe pain level." [11-9] 833. In fact, to relieve plaintiff's severe pain his physician and physical therapist encouraged him to walk a lot. [11-9] 833, 838.

Third, the ALJ implied that she discounted plaintiff's pain complaints in part because plaintiff was able to travel to Florida in July 2013. [11-1] 32. The ALJ states, "[plaintiff] was able to travel to Florida to visit his daughter and sister without exacerbation, despite doctor concern for high humidity and heat." [*Id.*]. No inference should be drawn about plaintiff's general condition simply "because he tolerated [a]

9

flight." *See Flores*, 19 Fed App'x at 404. Here, nothing in the record suggests that plaintiff engaged in prolonged or strenuous activity on that trip to indicate that his claimed limitations or symptoms were incredible. *Id.*

Fourth, the ALJ found that plaintiff's complaints were not entirely credible because plaintiff did not apply for disability until May 2014 despite an alleged disability onset date of December 2011. [11-1] 34. In an earlier part of the opinion, the ALJ noted that plaintiff worked after his alleged onset date. [*Id.*] 24. From July 2011 to December 2012, plaintiff worked as a general manager at an auto dealership. [11-5] 430, 450. Plaintiff explained that during this time his condition deteriorated and at the end of six months he was laid off. [*Id.*] 462. As noted above, a claimant's work during the alleged disability period is relevant to assessing his credibility. *See Grotts,* 27 F.4th at 1278. Here, there is no indication that the ALJ considered plaintiff's attempt to go back to work, despite his alleged pain and symptoms, in accounting for plaintiff's delay in applying for disability, or more generally, in evaluating his credibility. The ALJ's failure to do so was in error. *Pierce*, 739 F.3d at 1051 (A claimant's "dogged efforts to work beyond [his] physical capacity" is "highly relevant in deciding [his] credibility and determining whether [he] is trying to obtain government benefits by exaggerating [his] pain symptoms.").

After the reasons discussed are stripped from the ALJ's credibility determination, all that remains is the ALJ's claim that "claimant had largely unremarkable objective findings to support disabling limitations correlated to his pain complaints." [11-1] 35. An ALJ may not discredit a claimant's pain complaints *solely* because they lack objective corroboration. *Lambert*, 896 F.3d at 778; *see also* 20 C.F.R. § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain . . . solely because the available objective medical evidence does not substantiate your statements."). Thus, the ALJ's credibility determination would effectively rest on the absence of objective support for plaintiff's complaints and violate 20 C.F.R. § 404.1529(c)(2). Because the ALJ's credibility determination rests on improper bases that are unsupported by the record, for the reasons discussed above, the ALJ's credibility determination was patently wrong.

### III. The ALJ's Flawed Credibility Determination is Not Harmless.

The credibility determination affected the ALJ's findings as to the extent of plaintiff's limitations, which directly impacted the outcome of Step Five, specifically, the ALJ's conclusion that plaintiff could perform his past work. [11-1] 37. The ALJ asked the vocational expert (VE) a more restrictive hypothetical based on plaintiff's allegation that his pain prevents him from sitting for longer than twenty minutes at a time, a limitation which the ALJ did not ultimately adopt. [11-1] 27; [11-2] 139-40, 160. The VE testified that if plaintiff had a sit/stand option that allowed him to sit or stand alternatively at the workstation such that he is not off task more than 10% of

the work period, then work would be precluded. [11-2] 160. Therefore, the ALJ's flawed adverse credibility cannot be deemed harmless.

## Conclusion

The decision of the SSA is reversed, and in accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: June 23, 2023**